| | DATE FILED: March 2, 2020 2:47 PM<br>FILING ID: 7DEB1B72FA9BE<br>CASE NUMBER: 2020CV30212 |
|---|---|
| **DISTRICT COURT, BOULDER COUNTY, COLORADO**<br>1776 6th Street, Boulder, CO 80302 | |
| **Plaintiff:**<br>ACTIVE INTEREST MEDIA, INC.<br><br>v.<br><br>**Defendant:**<br>TRAUB CAPITAL, LLC | ▲ COURT USE ONLY ▲ |
| *Attorney for Plaintiff*:<br>Michelle L. Alamo, Atty. Reg # 51781<br>Armstrong Teasdale LLP<br>4643 South Ulster Street, Suite 800<br>Denver, Colorado 80237<br>720.200.0676<br>720.200.0679<br>Email:    malamo@armstrongteasdale.com | Case No.<br><br>Div:         Crtr: |
| **COMPLAINT** ||

Plaintiff Active Interest Media, Inc., by its undersigned counsel, states the following as its Complaint against Defendant Traub Capital, LLC:

**PARTIES, JURISDICTION AND VENUE**

1. Plaintiff Active Interest Media, Inc. ("AIM") is headquartered in Boulder, Colorado with its offices located at 5720 Flatiron Pkwy. The company is organized under the laws of Delaware.

2. AIM is one of the world's largest enthusiast media companies, producing leading consumer and trade events, websites, magazines, and films and TV shows that reach 40 million readers, fans, and attendees in 85 countries. See, https://www.aimmedia.com/. The Company is organized into six "groups," including its Equine Network which includes among its many facets the second-richest equestrian competition in the world.[1]

---

[1] Located in the foothills of the Rocky Mountains, AIM is also well known for two of its other groups: (1) the Mountain Group (snow sports) which includes Ski Magazine and Warren Miller Entertainment (producing world famous ski movies); and (2) the Outdoor Group, featuring brands that cover a distinctive blend of mountain recreation, national park travel, and outdoor industry news.

1

**EXHIBIT 2**

3.  Defendant Traub Capital, LLC ("Defendant") is a private equity firm located at 477 Madison Avenue, 18th Floor, New York, NY. Defendant is organized under the laws of Delaware.

4.  Subject matter jurisdiction is proper in this Court because the amount in controversy exceeds $25,000.

5.  Defendant is subject to personal jurisdiction in the State of Colorado pursuant to C.R.S. § 13-1-124 because this cause of action arises from Defendant's transaction of business within Colorado.

6.  Venue is proper in this Court pursuant to C.R.C.P. 98©(1) because Defendant is a non-resident and C.R.C.P. 98©(2) because this is an action upon a contract that was to be performed in this county.

### STATEMENT OF OPERATIVE FACTS

7.  AIM and Defendant entered into negotiations for the sale of AIM's Equine Network to an entity to be formed Defendant as its affiliate (the "Proposed Transaction").

8.  In its bid package to prospective buyers, AIM proffered a proposed Securities Purchase Agreement (the "Proposed SPA") for the Proposed Transaction.

9.  In connection with the Proposed Transaction, for AIM the consulting firm KPMG opined to the Equine Network's 2019 Adjusted EBITDA as $11.3 million.

10. Defendant agreed to a specific purchase price [in a confidential amount] for the Equine Network on a "debt free, cash free basis" – subject to Defendant's evaluation and validation of "quality of earnings demonstrating 2019 adjusted EBITDA for the Equine Network of at least $10,430,000."

11. In connection with the negotiations for the Proposed Transaction, AIM and Defendant entered into a written agreement dated October 3, 2019 (the "Exclusivity Agreement"), in which AIM agreed to negotiate exclusively with Defendant through October 18, 2019 (5:00 pm eastern), pursuant to the terms and conditions contained therein. Defendant has possession of the Exclusivity Agreement and therefore a copy is not attached hereto.

12. The Exclusivity Agreement is expressly governed by Delaware law.

13. The Exclusivity Agreement expressly represents that Defendant and its legal counsel "believe [the SPA] is in substantially acceptable form and will require only the revisions and refinements recently discussed with [AIM's] counsel to put it in execution form."

14.	In the Exclusivity Agreement, Defendant agreed to deposit $485,000 (the "Deposit") into an escrow account as earnest money to be credited toward the purchase price for the acquisition of the Equine Network.

15.	In pertinent part, as to the limited circumstances under which the Deposit would be refunded to Defendant (the "Deposit Clause"), the Exclusivity Agreement provides a sub-clause (a):

> The Deposit will be refundable to [Defendant] only if (a) [Defendant's] quality of earnings demonstrates 2019 adjusted EBITDA for the Equine Network of less than $10,430,000, and [Defendant] is unwilling to complete the Proposed Transaction at the [confidential amount] purchase price on a debt free, cash free basis.

16.	The Exclusivity Agreement's Deposit Clause also permits a refund of the Deposit to Defendant under a clause (b), if:

> [AIM] elects not to proceed with the Proposed Transaction with a purchase price of [confidential amount] on terms substantially as set forth in the [Proposed SPA] and [Defendant's] issues list.

17.	As to the non-refundability of the Deposit, the Deposit Clause concludes:

> ***In all other circumstances, the Deposit will be payable to [AIM]*** and if and when the Proposed Transaction is closed [Defendant] will receive a credit against the purchase price in the amount of the Deposit. (emphasis added)

18.	Based upon the Exclusivity Agreement and the Deposit Clause therein, the parties negotiated and entered into a written Escrow Agreement dated October 10, 2019 (the "Escrow Agreement"), pursuant to which Defendant deposited the $485,000 into the Escrow Account thereby established. Defendant has possession of the Escrow Agreement and therefore a copy is not attached hereto. The Escrow Agreement establishes JPMorgan Chase Bank, N.A. as the Escrow Agent.

19.	The Escrow Agreement expressly is governed by Delaware law.

20.	Defendant engaged PricewaterhouseCoopers ("PwC") to evaluate and test the Equine Network's quality of earnings against the Exclusivity Agreement's benchmark floor of $10.43 million.

21.	On behalf of Defendant, PwC performed the work and offered suggestions for reductions of $700,000, for a 2019 adjusted EBITDA for the Equine Network of $10.6 million, more than the $10.43 million benchmark floor.

22. During a telephone call on October 18, 2019, Defendant's managing partner for investments, Brian Crosby, advised AIM's investment banker that the Equine Network's 2019 adjusted EBITDA exceeded the benchmark floor of $10.43 million.

23. By email, the investment banker so advised AIM and its legal counsel.

24. Later that same day, on behalf of Defendant, Mr. Crosby stated the following in an email to AIM's investment banker:

> In follow up to our call earlier this afternoon, I wanted to provide a recap in writing.
>
> As you know, as per the Exclusivity Letter, ***we are confirming in writing that the QofE demonstrates at least $10.43mm of 2019 Adjusted EBITDA and as a result of our QofE findings, we are not reducing our purchase price.*** As I mentioned, PwC found that the LTM EBITDA was off ~$450k on a comparative basis to KPMG's LTM EBITDA QofE earlier this year due to some softness over the last months.   In addition, they identified some adjustments that were small in scale and few in number, aggregating ~$250k.   So in total $700k off the 2019 Adjusted EBITDA of $11.3mm, or ~$10.6mm. (emphasis added)

25. Under the Deposit Clause, Mr. Crosby's verbal and written confirmation locked Defendant into the non-refundable Deposit of $485,000, per the express terms of sub-clause (a).

26. Under the Deposit Clause, sub-clause (b), AIM did not back out of the Proposed Transaction – it did not elect "not to proceed with the Proposed Transaction" at the agreed upon purchase price on terms substantially as set forth in the Proposed SPA and Defendant' "issues list."

27. Therefore, as of October 18, 2019, the Deposit of $485,000 was non-refundable to Defendant, but would be credited against Defendant's purchase price of AIM's Equine Network upon closing the Proposed Transaction.

28. The exclusivity period was extended three times, through December 9, 2019.

29. At all times through the AIM/Defendant exclusivity period that expired on December 9, 2019, AIM was willing and able to close the Proposed Transaction on the agreed upon terms.

30. However, by December 9, 2019, it became abundantly clear that Defendant was unwilling or unable to close the transaction on the agreed upon terms.

31. In December 2019 and January 2020, Defendant negotiated for substantial purchase price reductions and changes to the terms, including converting a portion of the purchase price payment at closing from cash to an unsecured seller note.

32. At all relevant times, AIM remained willing to complete the Proposed Transaction.

33. Throughout these events as transpired after the AIM/Defendant exclusivity expired on December 9, 2019, the Deposit Clause was never revised or amended.

34. Defendant was unable or unwilling to close the purchase of the Equine Network.

35. AIM terminated negotiations and discussions with Defendant.

36. In February 2020, due to Defendant's unwillingness or inability to complete and close upon the Proposed Transaction, AIM entered into exclusive negotiations to sell the Equine Network to another party.

37. AIM advised Defendant that it had entered into an exclusivity agreement with another party.

38. Defendant now contends that it is entitled to a refund of the $485,000 Deposit – despite the fact that as a matter of law the Deposit became non-refundable on October 18, 2019.

39. On February 26, 2020, Defendant transmitted to AIM a proposed joint instruction letter putatively directing the Escrow Agent to release the Deposit to Defendant.

40. AIM refuses to execute and deliver Defendant's proposed joint instruction letter.

41. Instead, by email on March 2, 2020, AIM has transmitted to Defendant a proposed joint instruction letter (in the form of Exhibit A) directing the Escrow Agent to release the Deposit to AIM.

42. AIM's proposed joint instruction letter fully comports with Defendant's contractual obligations to AIM under the Exclusivity Agreement (and the Deposit Clause set forth therein) and the Escrow Agreement, but Defendant will not execute and deliver it.

## COUNT I – BREACH OF CONTRACT

43. AIM restates and reavers the foregoing paragraphs as though the same were fully set forth herein.

44. Under the Exclusivity Agreement, and the Deposit Clause therein, Defendant owes the express contractual obligations to AIM alleged above.

45. Defendant's failure to authorize the release of the Deposit to AIM constitutes a breach of such contractual obligations.

46. Defendant's breach of contractual obligations proximately has caused damage to AIM.

## COUNT II – BREACH OF THE COVENANT OF
## GOOD FAITH AND FAIR DEALING

47. AIM restates and reavers the foregoing paragraphs as thought the same were fully set forth herein.

48. Under Delaware law, the covenant of good faith and fair dealing applies to the Exclusivity Agreement and the Escrow Agreement.

49. Defendant has breached the covenant of good faith and fair dealing as to the Exclusivity Agreement by acts and omissions to:

   (a) Improperly extend and stall the negotiations for the Proposed Transaction;

   (b) Conceal that it was unable to close Proposed Transaction due to the inability to finance the transaction or other reasons not disclosed;

   (c) Prevent AIM from securing payment of the Deposit by the Escrow Agent;

   (d) Improperly and wrongfully seek payment of the Deposit by the Escrow Agent to Defendant;

   (e) Misrepresent and omit material information concerning its intentions and its inability to finance or otherwise close the transaction; and

   (f) Tortiously interfere with AIM's contractual entitlement of payment of the Deposit by Escrow Agent.

50. Defendant's wrongful, tortious and inequitable conduct caused AIM to incur substantial additional fees and expenses.

51. Defendant breached the covenant of good faith and fair dealing as to the Escrow Agent by failing to enter in a joint instruction letter with AIM to direct the Escrow Agent to pay the Deposit to AIM.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Active Interest Media, Inc. ("AIM") requests that this Court enter a judgment in its favor:

   (a) Directing Defendant to execute and deliver to the Escrow Agent the joint instruction letter in the form of Exhibit A hereto;

   (b) Directing the Escrow Agent to pay the Deposit to AIM;

(c)  Awarding punitive damages available under Delaware law, See, e.g., *Tekstrom, Inc. v. Savla*, No. CIV.A. 05A-12-006JTV, 2006 WL 2338050 (Del. Super. Ct. July 31, 2006), aff'd, 918 A.2d 1171 (Del. 2007)("Punitive damage awards are recoverable for a breach of covenant of good faith and fair dealing if the conduct independently amounts to a tort."); and

(d)  Awarding such further and additional damages and relief as to which the Court determines AIM to be entitled.

Dated: March 2, 2020                            Respectfully submitted,

*/s/ Michelle L. Alamo*

Michelle L. Alamo, Atty. Reg. No. 51781
ARMSTRONG TEASDALE LLP
4643 South Ulster Street, Suite 800
Denver, Colorado 80237
Phone: (720) 200-0676
Fax: (720) 200-0679
Email: malamo@armstrongteasdale.com

Plaintiff's Address:
5720 Flatiron Pkwy
Boulder, CO 80301

# EXHIBIT A

**Escrow Release Notice – Joint Instructions**

JPMorgan Chase Bank, N.A., Escrow Services
4 NY Plaza, Floor 11
New York, NY  10004

Attention:  Renfred Pico / Donna Fitzsimmons
Fax No.:  212-552-2812
Email Address:  ec.escrow@jpmorgan.com

Date:  March 2, 2020

**Re:  Traub Capital LLC/Active Interest Media, Inc. – Escrow Agreement dated October 10, 2019
Escrow Account No. 528253318**

**Dear Sir/Madam:**

We refer to an escrow agreement dated October 10, 2019 among Traub Capital LLC, Active Interest Media, Inc. and JPMorgan Chase Bank, N.A., as Escrow Agent (the "**Escrow Agreement**").

Capitalized terms in this letter that are not otherwise defined shall have the same meaning given to them in the Escrow Agreement.

The Parties instruct the Escrow Agent to release the entirety of the Escrow Amount in the Escrow Account to the specified Party instructed below.

Amount: Entirety of the Escrow Amount in the Escrow Account
Beneficiary: Active Interest Media, Inc.
City: Boulder, CO  80301
Country: United States of America

**US Instructions:**

Bank Name:
ABA Number:
Account Name:
Account Number:
        Bank Contact:


**FOR AND ON BEHALF OF TRAUB CAPITAL LLC:**


By:_____
Name:
Date:
Title:

**FOR AND ON BEHALF OF ACTIVE INTEREST MEDIA, INC.:**


By:_____
Name:
Date:
Title: